IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN SUTTON,<br><br>    Plaintiff,<br><br>   v.<br><br>BRANDYWINE REALTY TRUST; PRENTISS PROPERTIES CHANGE IN CONTROL SEVERANCE PROTECTION PLAN FOR KEY EMPLOYEES; and DANIEL CUSHING,<br><br>    Defendants.<br>_____/ | No. C 07-1109 CW<br><br>ORDER GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |

    Defendants Brandywine Realty Trust, Prentiss Properties Change in Control Severance Protection Plan for Key Employees and Daniel Cushing move for summary judgment.  Plaintiff John Sutton opposes Defendants' motion.  The matter was heard on March 6, 2008.  Having considered oral argument and all of the materials submitted by the parties, the Court grants Defendants' motion in part and denies it in part.

BACKGROUND[1]

Plaintiff began working for Prentiss Properties in January, 2005 as the Vice President of Development in Prentiss' Oakland office. Cushing was his direct supervisor. In January, 2006, Brandywine acquired Prentiss, becoming Plaintiff's employer.

Prior to its acquisition by Brandywine, Prentiss had adopted a benefits plan entitled, "Prentiss Properties Trust Change in Control Severance Protection Plan for Key Employees" (the Severance Plan). Under the Severance Plan, certain Prentiss employees, including Plaintiff, were eligible for severance pay if, within one year after a "Change in Control," i.e., Prentiss' acquisition by another company, their employment was terminated without cause or if they resigned from employment for "Good Reason." The Severance Plan defines "Good Reason" as:

> (a) The Company requiring the Participant's relocation more than fifty (50) miles from the Participant's primary office subsequent to the Change in Control, without such Participant's consent;
>
> (b) A material adverse alteration in the nature of his or her position, provided that (i) a change of title or (ii) a change of reporting and, in either case, a concomitant change of duties, shall not be considered a material adverse alteration unless the duties are materially inconsistent with the participant's duties at the time of [sic] the Change in Control took place;
>
> (c) Exclusion from the Company's, or upon a Change of

---

[1] This section describes Plaintiff's version of events, which is supported primarily by deposition testimony, because Plaintiff's allegations must be taken as true on this motion. Defendants raise several objections to the evidence adduced in support of Plaintiff's opposition to their motion. Most of these objections are based on the opposition brief's characterization of deposition testimony. Because the Court has reviewed the deposition testimony itself, these objections are overruled. Defendants' other objections are also overruled because the Court did not rely on any impermissible hearsay or lay opinion evidence in reaching its decision on this motion.

2

1
2
>     Control, its successor's, long term incentive plan or
>     reduction by the Company of the Participant's (i) annual
>     base salary, or (ii) target bonus; or

3
4
>     (d)  An assignment of duties to the Participant that are
>     materially inconsistent with his or her job description
>     at the time the Change in Control took place.

Riechert Dec. Ex. A:7 at § 2.16.

On August 8, 2006, Plaintiff learned that Cushing had recently instructed Cushing's secretary to pretend to be Cushing and take an online real estate exam in Cushing's place, in violation of California law. Two days later, Plaintiff reported Cushing's illegal activity to Brandywine's general counsel, Brad Molotsky. As Brandywine's Broker of Record in California, Plaintiff considered himself under an ethical and legal obligation to do so. Brandywine's Human Resources Department investigated the incident and ultimately sent letters of reprimand to Cushing and his secretary.

On or about August 18, 2006, Cushing learned that Plaintiff had reported the cheating incident, and almost immediately began retaliating against Plaintiff. On August 22, Cushing called Plaintiff and told him that he knew Plaintiff had reported the incident. On August 28, 2006, he called Plaintiff into a meeting to discuss the matter, during which he became irate and verbally berated Plaintiff. He also threatened Plaintiff with termination, telling him, "I should have terminated you the last time." Curliano Dec. Ex. A at 162. Shortly after the meeting, Cushing went to Plaintiff's office and told him, "We can't make it going forward. If your -- if I offend you in a month or three months from now, we'll just be back in the same spot." Id. at 169.

The next day, Cushing further expressed his doubt that he and

Plaintiff could continue to work together, stating, "If [CEO] Jerry Sweeney says you both continue, . . . I'm not sure I can work with you, and I may leave." Id. at 173. During this conversation, Plaintiff suggested that, as an alternative to Cushing leaving, he himself could leave. Id. at 175. As the two discussed how to "spin" Plaintiff's potential separation from Brandywine, Plaintiff suggested that his departure could be styled as a "retirement" that was not directly linked to his reporting the cheating incident. Cushing also raised the possibility of financial compensation for Plaintiff's leaving, but no specific terms were agreed upon. As a result of the meeting, Plaintiff formed the impression that he had been targeted by senior executives, including Sweeney, because he had exposed the cheating incident. He left the meeting with the "realization that [he] clearly was going to be out the door." Id. at 177.

Over the next several weeks, Cushing pressed Plaintiff to finalize the terms of a deal that would result in the two not having to work in proximity with each other. Plaintiff believed that, because he had been targeted by headquarters, moving to another Brandywine office would not be a viable option. Accordingly, he attempted to negotiate the terms of a separation package with Cushing, but the two were not able to finalize the details of any agreement.

On September 19, 2006, Plaintiff contacted Molotsky and told him that he was not comfortable negotiating with Cushing. Shortly thereafter, Don Denzin, the head of Brandywine's Human Resources Department, met with Plaintiff to discuss his retirement. During this meeting, Plaintiff mentioned the cheating incident and

4

expressed his view that it "would not look very good for Mr. Cushing or the company" if the matter were disclosed to the public, such as through litigation. Id. at 207. Denzin and Plaintiff attempted to negotiate a separation package, but were not able to agree on the amount of compensation Plaintiff would receive. Denzin left the meeting with the impression that Plaintiff's conflict with Cushing "was central to his desire to leave the company." Curliano Dec. Ex. D at 204.

During the next couple of months, Cushing began to take additional steps to deny Plaintiff opportunities for his advancement and to erect barriers between Plaintiff and his colleagues, all in an attempt to force Plaintiff out of his position. For instance, Cushing began attending meetings he had never attended before, as well as holding additional meetings, in order to familiarize himself with Plaintiff's projects and duties. He then began taking over Plaintiff's responsibilities. On one occasion, Cushing led Brandywine's Board of Directors on a tour of downtown Oakland. This is something Plaintiff normally would have done, given the responsibilities of his position. On another occasion, Cushing gave a presentation at an analysts' meeting that Sweeney attended. Plaintiff, who normally would have given the presentation, was not permitted to participate meaningfully in the meeting. Cushing thereby denied Plaintiff the opportunity to make a positive impression on Brandywine's CEO. Cushing also adopted a cold and formal demeanor with Plaintiff.

On December 5, 2006, Plaintiff submitted a notice of his resignation. In this notice, he stated that his resignation was for "Good Reason" under the Severance Plan, and that he therefore

5

sought severance benefits.  Brandywine refused to give these benefits to Plaintiff, and Plaintiff brought the present lawsuit.  He charges Defendants with: 1) breach of the terms of the Severance Plan; 2) constructive discharge in violation of public policy; and 3) intentional infliction of emotional distress.

## LEGAL STANDARD

Summary judgment is properly granted when no genuine and disputed issues of material fact remain, and when, viewing the evidence most favorably to the non-moving party, the movant is clearly entitled to prevail as a matter of law.  Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Eisenberg v. Ins. Co. of N. Am., 815 F.2d 1285, 1288-89 (9th Cir. 1987).

The moving party bears the burden of showing that there is no material factual dispute.  Therefore, the court must regard as true the opposing party's evidence, if supported by affidavits or other evidentiary material.  Celotex, 477 U.S. at 324; Eisenberg, 815 F.2d at 1289.  The court must draw all reasonable inferences in favor of the party against whom summary judgment is sought.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Intel Corp. v. Hartford Accident & Indem. Co., 952 F.2d 1551, 1558 (9th Cir. 1991).

Where the moving party does not bear the burden of proof on an issue at trial, the moving party may discharge its burden of production by either of two methods:

> The moving party may produce evidence negating an essential element of the nonmoving party's case, or, after suitable discovery, the moving party may show that the nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its

6

ultimate burden of persuasion at trial. Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Cos., Inc., 210 F.3d 1099, 1106 (9th Cir. 2000).

If the moving party discharges its burden by showing an absence of evidence to support an essential element of a claim or defense, it is not required to produce evidence showing the absence of a material fact on such issues, or to support its motion with evidence negating the non-moving party's claim. Id.; see also Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 885 (1990); Bhan v. NME Hosps., Inc., 929 F.2d 1404, 1409 (9th Cir. 1991). If the moving party shows an absence of evidence to support the non-moving party's case, the burden then shifts to the non-moving party to produce "specific evidence, through affidavits or admissible discovery material, to show that the dispute exists." Bhan, 929 F.2d at 1409.

If the moving party discharges its burden by negating an essential element of the non-moving party's claim or defense, it must produce affirmative evidence of such negation. Nissan, 210 F.3d at 1105. If the moving party produces such evidence, the burden then shifts to the non-moving party to produce specific evidence to show that a dispute of material fact exists. Id.

## DISCUSSION

### I. Breach of the Severance Plan

Under the federal common law of ERISA, terms in ERISA insurance polices are interpreted "in an ordinary and popular sense," as they would be interpreted by "a person of average intelligence and experience." Padfield v. AIG Life Ins. Co., 290 F.3d 1121, 1125 (9th Cir. 2002) (quoting Babikian v. Paul Revere

7

1 Life Ins. Co., 63 F.3d 837, 840 (9th Cir. 1995)).  When
2 interpreting a contract governed by ERISA, "courts should first
3 look to explicit language of the agreement to determine, if
4 possible, the clear intent of the parties." Gilliam v. Nev. Power
5 Co., 488 F.3d 1189, 1194 (9th Cir. 2007) (quoting Armistead v.
6 Vernitron Corp., 944 F.2d 1287, 1293 (6th Cir. 1991)).

     The relevant provision of the Severance Plan provides that an employee who experiences "a material adverse alteration in the nature of his or her position" is entitled to severance benefits under certain circumstances.  Plaintiff has testified that Cushing berated him for reporting the cheating incident, then began a sustained campaign to undermine his ability to succeed at Brandywine.  To this end, Cushing usurped some of Plaintiff's responsibilities and attempted to deprive him of opportunities to demonstrate to Brandywine executives that he was an asset to the company.  Cushing also pressured Plaintiff to resign, telling him that it would not be possible for him to continue working under Cushing.

     Based on this evidence, a juror could reasonably conclude that these events constituted a material adverse alteration in the nature of Plaintiff's position, as compared to the nature of his position prior to his reporting the cheating incident.  Thus, the Court denies Defendants' motion for summary judgment on Plaintiff's ERISA claim.

II.  Constructive Discharge in Violation of Public Policy

     Under California law, "[a]n actual or constructive discharge in violation of fundamental public policy gives rise to a tort action in favor of the terminated employee." Turner v.

8

1  Anheuser-Busch, Inc., 7 Cal. 4th 1238, 1252 (1994).  "Constructive
2  discharge occurs when the employer's conduct effectively forces an
3  employee to resign."  Id. at 1244.  This happens when the employer
4  subjects the employee to working conditions that are "so
5  intolerable or aggravated at the time of the employee's resignation
6  that a reasonable employer would realize that a reasonable person
7  in the employee's position would be compelled to resign."  Id. at
8  1251.[2]

9       On this motion, Plaintiff must merely show that a reasonable
10 juror could conclude from the evidence that he was subjected to
11 intolerable working conditions that forced him to resign.  As
12 described above, Plaintiff has testified that Cushing initiated a
13 campaign designed to prevent him from succeeding at Brandywine.
14 Based on this evidence, a juror could reasonably conclude that
15 Plaintiff had "no reasonable alternative except to quit."  Id. at
16 1248 (quoting Rochlis v. Walt Disney Co., 19 Cal. App. 4th 201, 212
17 (1993)).

18      There is also evidence demonstrating a causal link between the
19 allegedly intolerable conditions and Plaintiff's resignation.
20 Contrary to Defendants' argument, it is immaterial that Plaintiff
21 continued to work for four months after he reported Cushing's
22 cheating.  The intolerable conditions consist not of the cheating
23 incident itself, but of Cushing's retaliation against Plaintiff for

---

[2] If Plaintiff is able to show that he was constructively discharged for reporting Cushing's cheating, he still must show that his discharge was in violation of California's fundamental public policy.  Plaintiff argues that he has met this requirement because he was discharged for reporting conduct violating California Business & Professions Code § 10153.1.  While Defendants do not concede this point, they do not argue to the contrary on this motion.

9

reporting the incident.  This retaliation allegedly continued up until Plaintiff's resignation.

Because there are triable issues of fact with respect to Plaintiff's claim for constructive discharge in violation of public policy, Defendants' motion for summary judgment on this claim is denied.

III. Intentional Infliction of Emotional Distress

The elements of a cause of action for intentional infliction of emotional distress (IIED) are (1) extreme and outrageous conduct; (2) intended to cause or done in reckless disregard for causing; (3) severe emotional distress; and (4) actual and proximate causation.  See Cervantez v. J.C. Penney Co., Inc., 24 Cal. 3d 579, 593 (1979).  The conduct must be so extreme as to "exceed all bounds of that usually tolerated in a civilized community," id., and the distress so severe "that no reasonable [person] in a civilized society should be expected to endure it." Fletcher v. W. Nat'l Life Ins. Co., 10 Cal. App. 3d 376, 397 (1970).

While Plaintiff has alleged conduct that is inappropriate and possibly unlawful he has not described outrageous conduct beyond all bounds of what is accepted in a civilized society.  Nor has he cited any case in which a plaintiff was permitted to proceed on an IIED claim based on factually similar events.  In Kovatch v. California Casualty Management Co., Inc., 65 Cal. App. 4th 1256, 1277 (1998), the court held that sexual harassment and harassment based on sexual orientation necessarily exceeds what is tolerated by a decent society.  Accordingly, where the evidence precludes summary judgment on such a harassment claim, it will generally also

10

preclude summary judgment on a corresponding IIED claim.  However, the conduct alleged by Plaintiff, while disturbing, cannot be equated with the sort of repugnant discrimination described in Kovatch.

Because no reasonable juror could conclude from the evidence in the record that Plaintiff was subjected to extreme and outrageous conduct exceeding all bounds of that usually tolerated in a civilized community, his claim for intentional infliction of emotional distress must be summarily adjudicated against him.

## CONCLUSION

For the reasons set forth above, the Court GRANTS IN PART and DENIES IN PART Defendants' motion for summary judgment.  Summary judgment is granted on Plaintiff's claims for intentional infliction of emotional distress.  Plaintiff may proceed with his claims for violation of the Severance Plan and wrongful discharge in violation of public policy.

IT IS SO ORDERED.

Dated: 4/4/08

CLAUDIA WILKEN
United States District Judge

11